## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | |
|---|---|
| **TANNER WOLCOTT** and **ALICIA WOLCOTT**, on behalf of themselves and all others similarly situated, | No. 1:24-cv-01832 |
| Plaintiffs, | |
| v. | **CLASS ACTION COMPLAINT** |
| **ELYRIA FOUNDRY HOLDINGS, LLC**, | **DEMAND FOR JURY TRIAL** |
| Defendant. | |

Tanner Wolcott and Alicia Wolcott ("Plaintiffs"), through their attorneys, individually and on behalf of all others similarly situated, bring this Class Action Complaint against Defendant Elyria Foundry Holdings, LLC ("Elyria" or "Defendant"), and its present, former, or future direct and indirect parent companies, subsidiaries, affiliates, agents, and/or other related entities. Plaintiffs allege the following on information and belief—except as to their own actions, counsel's investigations, and facts of public record.

### NATURE OF ACTION

1.      This class action arises from Defendant's failure to protect highly sensitive data.

2.      Defendant is a manufacturer of "gray and ductile iron castings" based in Elyria, Ohio, and with a second location in Greenville, Pennsylvania.[1]

3.      As such, Defendant stores a multitude of highly sensitive personally identifiable information ("PII") about its current and former employees (and their spouses and dependents).

---

[1] *Hodge Foundry*, Elyria Foundry, https://www.elyriafoundry.com/hodge-foundry/ (last visited Oct. 14, 2024).

But Defendant lost control over that data when cybercriminals infiltrated its insufficiently protected computer systems in a data breach (the "Data Breach").

4.      It is unknown for precisely how long the cybercriminals had access to Defendant's network before the breach was discovered. In other words, Defendant had no effective means to prevent, detect, stop, or mitigate breaches of its systems—thereby allowing cybercriminals unrestricted access to its current and former employees' (and their spouses' and dependents') PII.

5.      On information and belief, cybercriminals were able to breach Defendant's systems because Defendant failed to adequately train its employees on cybersecurity and failed to maintain reasonable security safeguards or protocols to protect the Class's PII. In short, Defendant's failures placed the Class's PII in a vulnerable position—rendering them easy targets for cybercriminals.

6.      Plaintiffs are Data Breach victims, having received breach notices, one of which is attached hereto as Exhibit A. They bring this class action on behalf of themselves, and all others harmed by Defendant's misconduct.

7.      The exposure of one's PII to cybercriminals is a bell that cannot be unrung. Before this data breach, the private information of Defendants' current and former employees (and their spouses and dependents) was exactly that—private. Now, it is forever exposed and unsecure.

## PARTIES

8.      Plaintiff, Tanner Wolcott, is a natural person and citizen of Pennsylvania where he intends to remain.

9.      Plaintiff, Alicia Wolcott, is a natural person and citizen of Pennsylvania where she intends to remain.

10.     Defendant, Elyria Foundry Holdings LLC, is a limited liability company formed under the laws of Delaware and with its principal place of business in Elyria, Ohio.

## JURISDICTION AND VENUE

11.     This Court has subject matter jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2): the amount in controversy exceeds $5 million, exclusive of interest and costs; Plaintiffs and Defendant are citizens of different states;[2] and there are over 100 putative Class Members.

12.     This Court has personal jurisdiction over Defendant because it is headquartered in Ohio, regularly conducts business in Ohio, and has sufficient minimum contacts in Ohio.

13.     Venue is proper in this Court because Defendant's principal office is in this District, and because a substantial part of the events, acts, and omissions giving rise to Plaintiffs' claims occurred in this District.

## BACKGROUND

### *Defendant Collected and Stored the PII of Plaintiffs and the Class*

14.     Defendant is a manufacturer of "gray and ductile iron castings" based in Elyria, Ohio, and with a second location in Greenville, Pennsylvania.[3]

---

[2] Under the Class Action Fairness Act, "an unincorporated association shall be deemed to be a citizen of the State where it has its principal place of business and the State under whose laws it is organized." 28 U.S.C. § 1332(d)(10). *See, e.g., Ferrell v. Express Check Advance of S.C. LLC*, 591 F.3d 698, 699–700 (4th Cir. 2010) ("In this appeal, we hold that, for purposes of determining subject matter jurisdiction under the Class Action Fairness Act . . . a limited liability company is an 'unincorporated association' as that term is used in 28 U.S.C. § 1332(d)(10) and therefore is a citizen of the State under whose laws it is organized and the State where it has its principal place of business."); *Cedar Lodge Plantation LLC v. CSHV Fairway View I LLC*, 768 F.3d 425, 426 n.2 (5th Cir. 2014) (applying Section 1332(d)(10) to an LLC and noting that "the district court incorrectly applied a non-CAFA standard to the L.L.C."); *City of E. St. Louis v. Netflix Inc*., 83 F.4th 1066, 1071 (7th Cir. 2023) (applying Section 1332(d)(10) to an LLC while noting that "[t]oday is the first time this circuit has considered how § 1332(d)(10) works"). Thus, as an LLC, Defendant Elyria Foundry Holdings LLC is a citizen of Delaware (state of formation) and Ohio (principal place of business).

[3] *Hodge Foundry*, *supra*, https://www.elyriafoundry.com/hodge-foundry/.

15.     As part of its business, Defendant receives and maintains the PII of thousands of its current and former employees (and their spouses and dependents).

16.     In collecting and maintaining the PII, Defendant agreed it would safeguard the data in accordance with its internal policies, state law, and federal law. After all, Plaintiffs and Class Members themselves took reasonable steps to secure their PII.

17.     Under state and federal law, businesses like Defendant have duties to protect its current and former employees' (and their spouses' and dependents') PII and to notify them about breaches.

18.     Defendant recognizes these duties, declaring in its "Privacy Policy" that:

> a.     "This Privacy Policy Statement (the 'Privacy Statement') explains how [Defendant] collects, uses, stores, processes, discloses and deletes Personal Data (as defined herein) you provide directly to us[.]"[4]

> b.     "We are committed to protecting your privacy."[5]

> c.     "Any information provided is securely stored with our business partners and other organizations and individuals with which we have established a strategic alliance or other contractual relationship."[6]

> d.     "We are committed to ensuring the security of your Personal Data."[7]

---

[4] *Privacy Policy*, Elyria Foundry (August 2019), https://www.elyriafoundry.com/elyria-foundry/privacy-policy/ (last visited Oct. 21, 2024).

[5] *Id*.

[6] *Id*.

[7] *Id*.

e. "In order to prevent unauthorized access or disclosure, we have put in place suitable physical, electronic and managerial procedures to safeguard and secure the information we collect[.]"[8]

***Defendant's Data Breach***

19. On June 24, 2024, Defendant was hacked in the Data Breach.[9]

20. Worryingly, Defendant already admitted that:

a. "The investigation found that for a few hours between June 24, 2024, and June 25, 2024, an unknown actor accessed part of our network and may have viewed and/or copied some of our files."[10]

b. "Our review found that information about current and former employees and their spouses and dependents may have been impacted by this incident."[11]

c. "The investigation did not confirm whether your information was actually viewed or taken, but we cannot rule out this possibility."[12]

d. "This incident affected our Elyria Foundry and Hodge Foundry locations."[13]

21. Because of Defendant's Data Breach, at least the following types of PII were compromised: names and Social Security numbers.[14]

---

[8] *Id.*

[9] *Notice of Data Privacy Event*, Elyria Foundry (Sept. 3, 2024), https://www.elyriafoundry.com/media/hhucfcug/elyria-web-notice.pdf (last visited Oct. 21, 2024).

[10] *Id.*

[11] *Id.*

[12] *Id.*

[13] *Id.*

[14] *Id.*

22.     In total, Defendant injured at least 2,193 persons—via the exposure of their PII—in the Data Breach. Upon information and belief, these 2,193 persons include its current and former employees (and their spouses and dependents).[15]

23.     And yet, Defendant waited over until September 3, 2024, before it began notifying the class—a full 71 days after the Data Breach began.[16]

24.     Thus, Defendant kept the Class in the dark—thereby depriving the Class of the opportunity to try and mitigate their injuries in a timely manner.

25.     And when Defendant did notify Plaintiffs and the Class of the Data Breach, Defendant acknowledged that the Data Breach created a present, continuing, and significant risk of suffering identity theft, warning Plaintiffs and the Class:

    a.     "stay alert for incidents of identity theft and fraud by reviewing your account statements and checking your free credit reports for suspicious activity and to detect errors[;]"

    b.     "contact the three major credit reporting bureaus listed below to request a free copy of their credit report[;]" and

    c.     "educate [yourself] regarding identity theft, fraud alerts, credit freezes, and the steps [you] can take to protect your personal information by contacting the consumer reporting bureaus, the Federal Trade Commission, or [your] state Attorney General."[17]

---

[15] Elyria Foundry Holdings, LLC, *Data Breach Notifications*, Office of the Maine Atty. Gen. (Sept. 3, 2024), https://www.maine.gov/agviewer/content/ag/985235c7-cb95-4be2-8792- a1252b4f8318 /b887959e-2c69-498b-9873-e35f2baf9c2d.html (last visited Oct. 21, 2024).

[16] *Notice of Data Privacy Event*, *supra*, https://www.elyriafoundry.com/media/hhucfcug/elyria-web-notice.pdf.

[17] *Id*.

26.     Defendant failed its duties when its inadequate security practices caused the Data Breach. In other words, Defendant's negligence is evidenced by its failure to prevent the Data Breach and stop cybercriminals from accessing the PII. And thus, Defendant caused widespread injury and monetary damages.

27.     Since the breach, Defendant has declared that "we made additional improvements to our network's security[.]"[18]

28.     But such simple declarations are insufficient to ensure that Plaintiffs' and Class Members' PII will be protected from additional exposure in a subsequent data breach.

29.     Further, the Notice of Data Breach shows that Defendant cannot—or will not—determine the full scope of the Data Breach, as Defendant has been unable to determine precisely what information was stolen and when.

30.     Defendant has done little to remedy its Data Breach. True, Defendant has offered some victims credit monitoring and identity related services. But upon information and belief, such services are wholly insufficient to compensate Plaintiffs and Class Members for the injuries that Defendant inflicted upon them.

31.     Because of Defendant's Data Breach, the sensitive PII of Plaintiffs and Class Members was placed into the hands of cybercriminals—inflicting numerous injuries and significant damages upon Plaintiffs and Class Members.

***Playcrypt & the Dark Web***

32.     Worryingly, the cybercriminals that obtained Plaintiffs' and Class Members' PII appear to be the notorious cybercriminal group "Playcrypt."[19]

---

[18] *Id.*

[19] BreachSense, *Elyria*, https://www.breachsense.com/breaches/elyria-foundry-data-breach/ (last visited Oct. 21, 2024).

33.     Playcrypt (a.k.a., "Play Ransomware") is an especially notorious cybercriminal group. In fact, the Federal Bureau of Investigation (FBI) and the Cybersecurity and Infrastructure Security Agency (CISA) released a joint report warning the public about Play Ransomware.[20]Specifically, the joint "Cybersecurity Advisory" (CSA) stated, *inter alia*, that:

a.     "Since June 2022, the Play (also known as Playcrypt) ransomware group has impacted a wide range of businesses and critical infrastructure in North America, South America, and Europe."[21]

b.     "The Play ransomware group is presumed to be a closed group, designed to 'guarantee the secrecy of deals,' according to a statement on the group's data leak website."[22]

c.     "Play ransomware actors employ a double-extortion model, encrypting systems after exfiltrating data."[23]

d.     "If a victim refuses to pay the ransom demand, the ransomware actors threaten to publish exfiltrated data to their leak site on the Tor network."[24]

34.     Here, third-party reports reveal that Playcrypt promised to **publish** the stolen PII by July 11, 2024.[25] A screenshot of Playcrypt's Dark Web webpage is reproduced below.[26] Thus, upon information and belief, the stolen PII was **already published** on the Dark Web by Playcrypt.

---

[20] FBI & CISA, *#StopRansomware: Play Ransomware* (Dec. 18, 2023) https://www.cisa.gov/news-events/cybersecurity-advisories/aa23-352a (last visited Oct. 21, 2024).

[21] *Id.*

[22] *Id.*

[23] *Id.*

[24] *Id.*

[25]   @FalconFeedsio, X (July 4, 2024, 9:50 PM), https://x.com/FalconFeedsio/status/1809057174951284824 (last visited Oct. 21, 2024).

[26] *Id.*



35.     Furthermore, a separate screenshot (reproduced below) reveals that the stolen PII includes "Private and personal confidential data, clients [*sic*] documents, budget, payroll, accounting, contracts, taxes, IDs, finance information and etc."[27]



36.     Thus, upon information and belief, the scope of PII exposed is ***far greater*** compared to what Defendant has disclosed thus far.  Thus, upon information and belief, the exposed PII of Plaintiffs and Class Members includes:

      a.      names;

      b.      Social Security numbers;

      c.      "Private and personal confidential data[;]"

---

[27] RansomLook, *Play*, https://www.ransomlook.io/group/play (last visited Oct. 21, 2024).

    d.     "accounting" information;

    e.     "contract[]" information;

    f.     "tax[]" information;

    g.     personal "IDs"; and

    h.     "finance information." [28]

37.    Critically, the "views" of Playcrypt's Dark Web website has been ***steadily increasing*** over time—which evidences that the PII of Plaintiffs and Class Members is being actively disseminated among cybercriminals on the Dark Web.

38.    ***First***, a screenshot seemingly from July 4, 2024, listed "246" views.[29]

39.    ***Second***, a screenshot seemingly from July 4, 2024, listed "248" views.[30]

40.    ***Third***, a screenshot seemingly from July 4, 2024, listed "250" views.[31]

41.    ***Fourth***, a third-party report from July 5, 2024, listed "384" views.[32]

42.    Thus, upon information and belief, the PII of Plaintiffs and Class Members has been published—and is being actively disseminated—by cybercriminals (including Playcrypt) on the Dark Web.

***Plaintiff Tanner Wolcott's Experiences and Injuries***

43.    Plaintiff Tanner Wolcott is a former employee of Defendant (having worked for Defendant from approximately 2018 until 2019).

---

[28] *See id.*

[29] @Comparitech, X (Sept. 4, 2022, 2:08 AM) https://mobile.x.com/Comparitech/status/1831227801451597879 (last visited Oct. 21, 2024).

[30] RansomLook, *Play*, *supra*, https://www.ransomlook.io/group/play.

[31] @FalconFeedsio, X, *supra*, https://x.com/FalconFeedsio/status/1809057174951284824.

[32] HookPhish, *Ransomware Play Group Hits: Elyria Foundry* (July 5, 2024), https://www.hookphish.com/blog/ransomware-play-group-hits-elyria-foundry/ (last visited Oct. 21, 2024).

44.     Thus, Defendant obtained and maintained Plaintiff's PII. And as a result, Plaintiff was injured by Defendant's Data Breach.

45.     As a condition of his employment with Defendant, Plaintiff provided Defendant with his PII. Defendant used that PII to facilitate its employment of Plaintiff, including payroll, and required Plaintiff to provide that PII in order to obtain employment and payment for that employment.

46.     Plaintiff provided his PII to Defendant and trusted the company would use reasonable measures to protect it according to Defendant's internal policies, as well as state and federal law. Defendant obtained and continues to maintain Plaintiff's PII and has a continuing legal duty and obligation to protect that PII from unauthorized access and disclosure.

47.     Plaintiff reasonably understood that a portion of the funds derived from his employment would be used to pay for adequate cybersecurity and protection of PII.

48.     Plaintiff does not recall ever learning that his information was compromised in a data breach incident—other than the breach at issue here.

49.     Plaintiff received a Notice of Data Breach in October 2024.

50.     Thus, on information and belief, Plaintiff's PII has already been published—or will be published imminently—by cybercriminals on the Dark Web.

51.     Through its Data Breach, Defendant compromised ***at least*** Plaintiff's name and Social Security number. However, upon information and belief, and as alleged *supra*, a far greater range of Plaintiff's PII was stolen in the Data Breach.

52.     Plaintiff ***already*** suffered from identity theft and fraud—on June 24, 2024, cybercriminals stole his identity and used his PII to create a fraudulent account with "Spectrum."

53. Additionally, after the Data Breach, Plaintiff has been flooded with fraudulent attempts by cybercriminals to sign into his "Venmo" and "Apple" accounts.

54. Plaintiff has spent—and will continue to spend—significant time and effort monitoring his accounts to protect himself from identity theft. After all, Defendant directed Plaintiff to take those steps in its breach notice.

55. Indeed, Plaintiff spent approximately 5–10 hours changing his passwords and attempting to address the fraudulent Spectrum account created in his name.

56. And in the aftermath of the Data Breach, Plaintiff has suffered from a spike in spam and scam text messages (up to 10 times per day).

57. Plaintiff fears for his personal financial security and worries about what information was exposed in the Data Breach.

58. Because of Defendant's Data Breach, Plaintiff has suffered—and will continue to suffer from—anxiety, sleep disruption, stress, fear, and frustration. Such injuries go far beyond allegations of mere worry or inconvenience. Rather, Plaintiff's injuries are precisely the type of injuries that the law contemplates and addresses.

59. Plaintiff suffered actual injury from the exposure and theft of his PII—which violates his rights to privacy.

60. Plaintiff suffered actual injury in the form of damages to and diminution in the value of his PII. After all, PII is a form of intangible property—property that Defendant was required to adequately protect.

61. Plaintiff suffered imminent and impending injury arising from the substantially increased risk of fraud, misuse, and identity theft—all because Defendant's Data Breach placed Plaintiff's PII right in the hands of criminals.

62.     Because of the Data Breach, Plaintiff anticipates spending considerable amounts of time and money to try and mitigate his injuries.

63.     Today, Plaintiff has a continuing interest in ensuring that his PII—which, upon information and belief, remains backed up in Defendant's possession—is protected and safeguarded from additional breaches.

***Plaintiff Alicia Wolcott's Experiences and Injuries***

64.     Plaintiff Alicia Wolcott is the spouse of Plaintiff Tanner Wolcott.

65.     Pursuant to Tanner Wolcott's employment with Defendant, Defendant obtained the PII of Alicia Wolcott.

66.     As a result, Plaintiff was injured by Defendant's Data Breach.

67.     As a condition of Tanner Wolcott's employment with Defendant, Plaintiff provided Defendant with her PII. Defendant used that PII to facilitate its provision of employment benefits to Plaintiff Alicia Wolcott.

68.     In fact, Plaintiff Alicia Wolcott was required to provide her PII to Defendant in order to obtain employment-related benefits.

69.     Plaintiff provided her PII to Defendant and trusted the company would use reasonable measures to protect it according to Defendant's internal policies, as well as state and federal law. Defendant obtained and continues to maintain Plaintiff's PII and has a continuing legal duty and obligation to protect that PII from unauthorized access and disclosure.

70.     Plaintiff reasonably understood that a portion of the funds paid to Defendant (and/or derived from Tanner Wolcott's employment) would be used to pay for adequate cybersecurity and protection of PII.

71.     Plaintiff does not recall ever learning that her information was compromised in a data breach incident—other than the breach at issue here.

72.     Plaintiff received a Notice of Data Breach in October 2024.

73.     Thus, on information and belief, Plaintiff's PII has already been published—or will be published imminently—by cybercriminals on the Dark Web.

74.     Through its Data Breach, Defendant compromised *at least* Plaintiff's name and Social Security number. However, upon information and belief, and as alleged *supra*, a far greater range of Plaintiff's PII was stolen in the Data Breach.

75.     Plaintiff has *already* suffered from identity theft and fraud—in late June 2024, Plaintiff was informed by the IRS that someone had attempted to file her taxes using her PII.

76.     Plaintiff has spent—and will continue to spend—significant time and effort monitoring her accounts to protect herself from identity theft. After all, Defendant directed Plaintiff to take those steps in its breach notice.

77.     Indeed, Plaintiff spent approximately 5–10 hours attempting to address the identity theft reported by the IRS.

78.     And in the aftermath of the Data Breach, Plaintiff has suffered from a spike in spam and scam text messages.

79.     Plaintiff fears for her personal financial security and worries about what information was exposed in the Data Breach.

80.     Because of Defendant's Data Breach, Plaintiff has suffered—and will continue to suffer from—anxiety, sleep disruption, stress, fear, and frustration. Such injuries go far beyond allegations of mere worry or inconvenience. Rather, Plaintiff's injuries are precisely the type of injuries that the law contemplates and addresses.

81.     Plaintiff suffered actual injury from the exposure and theft of her PII—which violates her rights to privacy.

82.     Plaintiff suffered actual injury in the form of damages to and diminution in the value of her PII. After all, PII is a form of intangible property—property that Defendant was required to adequately protect.

83.     Plaintiff suffered imminent and impending injury arising from the substantially increased risk of fraud, misuse, and identity theft—all because Defendant's Data Breach placed Plaintiff's PII right in the hands of criminals.

84.     Because of the Data Breach, Plaintiff anticipates spending considerable amounts of time and money to try and mitigate her injuries.

85.     Today, Plaintiff has a continuing interest in ensuring that her PII—which, upon information and belief, remains backed up in Defendant's possession—is protected and safeguarded from additional breaches.

***Plaintiffs and the Proposed Class Face Significant Risk of Continued Identity Theft***

86.     Because of Defendant's failure to prevent the Data Breach, Plaintiffs and Class Members suffered—and will continue to suffer—damages. These damages include, *inter alia*, monetary losses, lost time, anxiety, and emotional distress. Also, they suffered or are at an increased risk of suffering:

       a.     loss of the opportunity to control how their PII is used;

       b.     diminution in value of their PII;

       c.     compromise and continuing publication of their PII;

       d.     out-of-pocket costs from trying to prevent, detect, and recovery from identity theft and fraud;

    e.      lost opportunity costs and wages from spending time trying to mitigate the fallout of the Data Breach by, *inter alia*, preventing, detecting, contesting, and recovering from identify theft and fraud;

    f.      delay in receipt of tax refund monies;

    g.      unauthorized use of their stolen PII; and

    h.      continued risk to their PII—which remains in Defendant's possession—and is thus as risk for futures breaches so long as Defendant fails to take appropriate measures to protect the PII.

87. Stolen PII is one of the most valuable commodities on the criminal information black market. According to Experian, a credit-monitoring service, stolen PII can be worth up to $1,000.00 depending on the type of information obtained.

88. The value of Plaintiffs and Class's PII on the black market is considerable. Stolen PII trades on the black market for years. And criminals frequently post and sell stolen information openly and directly on the "Dark Web"—further exposing the information.

89. It can take victims years to discover such identity theft and fraud. This gives criminals plenty of time to sell the PII far and wide.

90. One way that criminals profit from stolen PII is by creating comprehensive dossiers on individuals called "Fullz" packages. These dossiers are both shockingly accurate and comprehensive. Criminals create them by cross-referencing and combining two sources of data—first the stolen PII, and second, unregulated data found elsewhere on the internet (like phone numbers, emails, addresses, etc.).

91. The development of "Fullz" packages means that the PII exposed in the Data Breach can easily be linked to data of Plaintiffs and the Class that is available on the internet.

92.     In other words, even if certain information such as emails, phone numbers, or credit card numbers may not be included in the PII stolen by the cyber-criminals in the Data Breach, criminals can easily create a Fullz package and sell it at a higher price to unscrupulous operators and criminals (such as illegal and scam telemarketers) over and over. That is exactly what is happening to Plaintiffs and Class Members, and it is reasonable for any trier of fact, including this Court or a jury, to find that Plaintiffs and other Class Members' stolen PII is being misused, and that such misuse is fairly traceable to the Data Breach.

93.     Defendant disclosed the PII of Plaintiffs and Class Members for criminals to use in the conduct of criminal activity. Specifically, Defendant opened up, disclosed, and exposed the PII of Plaintiffs and Class Members to people engaged in disruptive and unlawful business practices and tactics, including online account hacking, unauthorized use of financial accounts, and fraudulent attempts to open unauthorized financial accounts (i.e., identity fraud), all using the stolen PII.

94.     Defendant's failure to promptly and properly notify Plaintiffs and Class Members of the Data Breach exacerbated Plaintiffs and Class Members' injury by depriving them of the earliest ability to take appropriate measures to protect their PII and take other necessary steps to mitigate the harm caused by the Data Breach.

***Defendant Knew—Or Should Have Known—of the Risk of a Data Breach***

95.     Defendant's data security obligations were particularly important given the substantial increase in cyberattacks and/or data breaches in recent years.

96.     In 2021, a record 1,862 data breaches occurred, exposing approximately 293,927,708 sensitive records—a 68% increase from 2020.[33]

97.     Indeed, cyberattacks have become so notorious that the Federal Bureau of Investigation ("FBI") and U.S. Secret Service issue warnings to potential targets, so they are aware of, and prepared for, a potential attack. As one report explained, "[e]ntities like smaller municipalities and hospitals are attractive to ransomware criminals . . . because they often have lesser IT defenses and a high incentive to regain access to their data quickly."[34]

98.     Therefore, the increase in such attacks, and attendant risk of future attacks, was widely known to the public and to anyone in Defendant's industry, including Defendant.

***Defendant Failed to Follow FTC Guidelines***

99.     According to the Federal Trade Commission ("FTC"), the need for data security should be factored into all business decision-making.  Thus, the FTC issued numerous guidelines identifying best data security practices that businesses—like Defendant—should use to protect against unlawful data exposure.

100.    In 2016, the FTC updated its publication, *Protecting Personal Information: A Guide for Business*. There, the FTC set guidelines for what data security principles and practices businesses must use.[35]  The FTC declared that, *inter alia*, businesses must:

      a.     protect the personal customer information that they keep;

---

[33] *See* Identity Theft Resource Center, *2021 Data Breach Annual Report* (Jan. 2022), https://www.wsav.com/wp-content/uploads/sites/75/2022/01/20220124_ITRC-2021-Data-Breach-Report.pdf (last visited Oct. 21, 2024).

[34] Ben Kochman, *FBI, Secret Service Warn of Targeted Ransomware*, Law360 (Nov. 18, 2019), https://www.law360.com/articles/1220974/fbi-secret-service-warn-of-targeted-ransomware (last visited Oct. 21, 2024).

[35] Fed Trade Comm'n, *Protecting Personal Information: A Guide for Business* (Oct. 2016), https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf (last visited Oct. 18, 2024).

       b.      properly dispose of personal information that is no longer needed;

       c.      encrypt information stored on computer networks;

       d.      understand their network's vulnerabilities; and

       e.      implement policies to correct security problems.

101.    The guidelines also recommend that businesses watch for the transmission of large amounts of data out of the system—and then have a response plan ready for such a breach.

102.    Furthermore, the FTC explains that companies must:

       a.      not maintain information longer than is needed to authorize a transaction;

       b.      limit access to sensitive data;

       c.      require complex passwords to be used on networks;

       d.      use industry-tested methods for security;

       e.      monitor for suspicious activity on the network; and

       f.      verify that third-party service providers use reasonable security measures.

103.    The FTC brings enforcement actions against businesses for failing to protect customer data adequately and reasonably. Thus, the FTC treats the failure—to use reasonable and appropriate measures to protect against unauthorized access to confidential consumer data—as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

104.    In short, Defendant's failure to use reasonable and appropriate measures to protect against unauthorized access to its current and former employees' (and their spouses' and dependents') data constitutes an unfair act or practice prohibited by Section 5 of the FTCA, 15 U.S.C. § 45.

*Defendant Failed to Follow Industry Standards*

105.     Several best practices have been identified that—at a *minimum*—should be implemented by businesses like Defendant. These industry standards include: educating all employees; strong passwords; multi-layer security, including firewalls, anti-virus, and anti-malware software; encryption (making data unreadable without a key); multi-factor authentication; backup data; and limiting which employees can access sensitive data.

106.     Other industry standard best practices include: installing appropriate malware detection software; monitoring and limiting the network ports; protecting web browsers and email management systems; setting up network systems such as firewalls, switches, and routers; monitoring and protection of physical security systems; protection against any possible communication system; and training staff regarding critical points.

107.     Upon information and belief, Defendant failed to implement industry-standard cybersecurity measures, including failing to meet the minimum standards of both the NIST Cybersecurity Framework Version 2.0 (including without limitation PR.AA-01, PR.AA.-02, PR.AA-03, PR.AA-04, PR.AA-05, PR.AT-01, PR.DS-01, PR-DS-02, PR.DS-10, PR.PS-01, PR.PS-02, PR.PS-05, PR.IR-01, DE.CM-01, DE.CM-03, DE.CM-06, DE.CM-09, and RS.CO-04) and the Center for Internet Security's Critical Security Controls (CIS CSC), which are all established standards in reasonable cybersecurity readiness.

108.     These frameworks are applicable and accepted industry standards. And by failing to comply with these accepted standards, Defendant opened the door to the criminals—thereby causing the Data Breach.

## CLASS ACTION ALLEGATIONS

109.    Plaintiffs bring this class action under Fed. R. Civ. P. 23(a), 23(b)(2), and 23(b)(3), individually and on behalf of all members of the following class:

> All individuals residing in the United States whose PII was compromised in the Data Breach discovered by Elyria in June 2024, including all those individuals who received notice of the breach.

110.    Excluded from the Class are Defendant, its agents, affiliates, parents, subsidiaries, any entity in which Defendant has a controlling interest, any Defendant officer or director, any successor or assign, and any Judge who adjudicates this case, including their staff and immediate family.

111.    Plaintiffs reserve the right to amend the class definition.

112.    Certification of Plaintiffs' claims for class-wide treatment is appropriate because Plaintiffs can prove the elements of their claims on class-wide bases using the same evidence as would be used to prove those elements in individual actions asserting the same claims.

113.    <u>Ascertainability</u>. All members of the proposed Class are readily ascertainable from information in Defendant's custody and control. After all, Defendant already identified some individuals and sent them data breach notices.

114.    <u>Numerosity</u>. The Class Members are so numerous that joinder of all Class Members is impracticable. Upon information and belief, the proposed Class includes at least 2,193 members.

115.    <u>Typicality</u>. Plaintiffs' claims are typical of Class Members' claims as each arises from the same Data Breach, the same alleged violations by Defendant, and the same unreasonable manner of notifying individuals about the Data Breach.

116.    <u>Adequacy</u>. Plaintiffs will fairly and adequately protect the proposed Class's common interests. Their interests do not conflict with Class Members' interests. And Plaintiffs

have retained counsel—including lead counsel—that is experienced in complex class action litigation and data privacy to prosecute this action on the Class's behalf.

117.  <u>Commonality and Predominance</u>. Plaintiffs' and the Class's claims raise predominantly common fact and legal questions—which predominate over any questions affecting individual Class Members—for which a class wide proceeding can answer for all Class Members. In fact, a class wide proceeding is necessary to answer the following questions:

    a.    if Defendant had a duty to use reasonable care in safeguarding Plaintiffs' and the Class's PII;

    b.    if Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

    c.    if Defendant were negligent in maintaining, protecting, and securing PII;

    d.    if Defendant breached contract promises to safeguard Plaintiffs and the Class's PII;

    e.    if Defendant took reasonable measures to determine the extent of the Data Breach after discovering it;

    f.    if Defendant's Breach Notice was reasonable;

    g.    if the Data Breach caused Plaintiffs and the Class injuries;

    h.    what the proper damages measure is; and

    i.    if Plaintiffs and the Class are entitled to damages, treble damages, and or injunctive relief.

118.  <u>Superiority.</u> A class action will provide substantial benefits and is superior to all other available means for the fair and efficient adjudication of this controversy.  The damages or

other financial detriment suffered by individual Class Members are relatively small compared to the burden and expense that individual litigation against Defendant would require. Thus, it would be practically impossible for Class Members, on an individual basis, to obtain effective redress for their injuries. Not only would individualized litigation increase the delay and expense to all parties and the courts, but individualized litigation would also create the danger of inconsistent or contradictory judgments arising from the same set of facts. By contrast, the class action device provides the benefits of adjudication of these issues in a single proceeding, ensures economies of scale, provides comprehensive supervision by a single court, and presents no unusual management difficulties.

## FIRST CAUSE OF ACTION
### Negligence
### (On Behalf of Plaintiffs and the Class)

119.    Plaintiffs incorporate by reference all other paragraphs as if fully set forth herein.

120.    Plaintiffs and the Class (or their third-party agents) entrusted their PII to Defendant on the premise and with the understanding that Defendant would safeguard their PII, use their PII for business purposes only, and/or not disclose their PII to unauthorized third parties.

121.    Defendant owed a duty of care to Plaintiffs and Class Members because it was foreseeable that Defendant's failure—to use adequate data security in accordance with industry standards for data security—would compromise their PII in a data breach. And here, that foreseeable danger came to pass.

122.    Defendant has full knowledge of the sensitivity of the PII and the types of harm that Plaintiffs and the Class could and would suffer if their PII was wrongfully disclosed.

123.    Defendant owed these duties to Plaintiffs and Class Members because they are members of a well-defined, foreseeable, and probable class of individuals whom Defendant knew

or should have known would suffer injury-in-fact from Defendant's inadequate security practices. After all, Defendant actively sought and obtained Plaintiffs and Class Members' PII.

124.    Defendant owed—to Plaintiffs and Class Members—at least the following duties to:

    a.    exercise reasonable care in handling and using the PII in its care and custody;

    b.    implement industry-standard security procedures sufficient to reasonably protect the information from a data breach, theft, and unauthorized;

    c.    promptly detect attempts at unauthorized access;

    d.    notify Plaintiffs and Class Members within a reasonable timeframe of any breach to the security of their PII.

125.    Thus, Defendant owed a duty to timely and accurately disclose to Plaintiffs and Class Members the scope, nature, and occurrence of the Data Breach. After all, this duty is required and necessary for Plaintiffs and Class Members to take appropriate measures to protect their PII, to be vigilant in the face of an increased risk of harm, and to take other necessary steps to mitigate the harm caused by the Data Breach.

126.    Defendant also had a duty to exercise appropriate clearinghouse practices to remove PII it was no longer required to retain under applicable regulations.

127.    Defendant knew or reasonably should have known that the failure to exercise due care in the collecting, storing, and using of the PII of Plaintiffs and the Class involved an unreasonable risk of harm to Plaintiffs and the Class, even if the harm occurred through the criminal acts of a third party.

128.    Defendant's duty to use reasonable security measures arose because of the special relationship that existed between Defendant and Plaintiffs and the Class. That special relationship arose because Plaintiffs and the Class (or their third-party agents) entrusted Defendant with their confidential PII, a necessary part of obtaining services from Defendant.

129.    Under the FTC Act, 15 U.S.C. § 45, Defendant had a duty to use fair and adequate computer systems and data security practices to safeguard Plaintiffs and Class Members' PII.

130.    Section 5 of the FTC Act prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair act or practice by businesses, such as Defendant, of failing to use reasonable measures to protect the PII entrusted to it. The FTC publications and orders promulgated pursuant to the FTC Act also form part of the basis of Defendant's duty to protect Plaintiffs and the Class Members' sensitive PII.

131.    Defendant violated its duty under Section 5 of the FTC Act by failing to use reasonable measures to protect PII and not complying with applicable industry standards as described in detail herein. Defendant's conduct was particularly unreasonable given the nature and amount of PII Defendant had collected and stored and the foreseeable consequences of a data breach, including, specifically, the immense damages that would result to individuals in the event of a breach, which ultimately came to pass.

132.    The risk that unauthorized persons would attempt to gain access to the PII and misuse it was foreseeable. Given that Defendant hold vast amounts of PII, it was inevitable that unauthorized individuals would attempt to access Defendant's databases containing the PII — whether by malware or otherwise.

133.    PII is highly valuable, and Defendant knew, or should have known, the risk in obtaining, using, handling, emailing, and storing the PII of Plaintiffs and Class Members' and the importance of exercising reasonable care in handling it.

134.    Defendant improperly and inadequately safeguarded the PII of Plaintiffs and the Class in deviation of standard industry rules, regulations, and practices at the time of the Data Breach.

135.    Defendant breached these duties as evidenced by the Data Breach.

136.    Defendant acted with wanton and reckless disregard for the security and confidentiality of Plaintiffs' and Class Members' PII by:

a.    disclosing and providing access to this information to third parties and

b.    failing to properly supervise both the way the PII was stored, used, and exchanged, and those in its employ who were responsible for making that happen.

137.    Defendant breached its duties by failing to exercise reasonable care in supervising its agents, contractors, vendors, and suppliers, and in handling and securing the personal information and PII of Plaintiffs and Class Members which actually and proximately caused the Data Breach and Plaintiffs and Class Members' injury.

138.    Defendant further breached its duties by failing to provide reasonably timely notice of the Data Breach to Plaintiffs and Class Members, which actually and proximately caused and exacerbated the harm from the Data Breach and Plaintiffs and Class Members' injuries-in-fact.

139.    Defendant has admitted that the PII of Plaintiffs and the Class was wrongfully lost and disclosed to unauthorized third persons because of the Data Breach.

140.    As a direct and traceable result of Defendant's negligence and/or negligent supervision, Plaintiffs and Class Members have suffered or will suffer damages, including monetary damages, increased risk of future harm, embarrassment, humiliation, frustration, and emotional distress.

141.    And, on information and belief, Plaintiffs' PII has already been published—or will be published imminently—by cybercriminals on the Dark Web.

142.    Defendant's breach of its common-law duties to exercise reasonable care and its failures and negligence actually and proximately caused Plaintiffs and Class Members actual, tangible, injury-in-fact and damages, including, without limitation, the theft of their PII by criminals, improper disclosure of their PII, lost benefit of their bargain, lost value of their PII, and lost time and money incurred to mitigate and remediate the effects of the Data Breach that resulted from and were caused by Defendant's negligence, which injury-in-fact and damages are ongoing, imminent, immediate, and which they continue to face.

## SECOND CAUSE OF ACTION
### Breach of Implied Contract
### (On Behalf of Plaintiffs and the Class)

143.    Plaintiffs incorporate by reference all other paragraphs as if fully set forth herein.

144.    Plaintiff and Class Members either directly contracted with Defendant or Plaintiff and Class Members were the third-party beneficiaries of contracts with Defendant.

145.    Plaintiffs and Class Members (or their third-party agents) were required to provide their PII to Defendant as a condition of receiving employment (and employment-related benefits) provided by Defendant. Plaintiffs and Class Members (or their third-party agents) provided their PII to Defendant or its third-party agents in exchange for Defendant's employment (and employment-related benefits).

146.    Plaintiffs and Class Members (or their third-party agents) reasonably understood that a portion of the funds they paid and/or derived from their labor would be used to pay for adequate cybersecurity measures.

147.    Plaintiffs and Class Members (or their third-party agents) reasonably understood that Defendant would use adequate cybersecurity measures to protect the PII that they were required to provide based on Defendant's duties under state and federal law and its internal policies.

148.    Plaintiffs and the Class Members (or their third-party agents) accepted Defendant's offers by disclosing their PII to Defendant or its third-party agents in exchange for employment (and employment-related benefits).

149.    In turn, and through internal policies, Defendant agreed to protect and not disclose the PII to unauthorized persons.

150.    In its Privacy Policy, Defendant represented that they had a legal duty to protect Plaintiffs' and Class Member's PII.

151.    Implicit in the parties' agreement was that Defendant would provide Plaintiffs and Class Members (or their third-party agents) with prompt and adequate notice of all unauthorized access and/or theft of their PII.

152.    After all, Plaintiffs and Class Members (or their third-party agents) would not have entrusted their PII to Defendant (or their third-party agents) in the absence of such an agreement with Defendant.

153.    Plaintiffs and the Class (or their third-party agents) fully performed their obligations under the implied contracts with Defendant.

154.    The covenant of good faith and fair dealing is an element of every contract. Thus, parties must act with honesty in fact in the conduct or transactions concerned. Good faith and fair dealing, in connection with executing contracts and discharging performance and other duties according to their terms, means preserving the spirit—and not merely the letter—of the bargain. In short, the parties to a contract are mutually obligated to comply with the substance of their contract in addition to its form.

155.    Subterfuge and evasion violate the duty of good faith in performance even when an actor believes their conduct to be justified. Bad faith may be overt or consist of inaction. And fair dealing may require more than honesty.

156.    Defendant materially breached the contracts it entered with Plaintiffs and Class Members (or their third-party agents) by:

a.      failing to safeguard their information;

b.      failing to notify them promptly of the intrusion into its computer systems that compromised such information.

c.      failing to comply with industry standards;

d.      failing to comply with the legal obligations necessarily incorporated into the agreements; and

e.      failing to ensure the confidentiality and integrity of the electronic PII that Defendant created, received, maintained, and transmitted.

157.    In these and other ways, Defendant violated its duty of good faith and fair dealing.

158.    Defendant's material breaches were the direct and proximate cause of Plaintiffs' and Class Members' injuries (as detailed *supra*).

159.     And, on information and belief, Plaintiffs' PII has already been published—or will be published imminently—by cybercriminals on the Dark Web.

160.     Plaintiffs and Class Members (or their third-party agents) performed as required under the relevant agreements, or such performance was waived by Defendant's conduct.

**THIRD CAUSE OF ACTION**
**Invasion of Privacy**
**(On Behalf of Plaintiffs and the Class)**

161.     Plaintiffs incorporate by reference all other paragraphs as if fully set forth herein.

162.     Plaintiffs and the Class had a legitimate expectation of privacy regarding their highly sensitive and confidential PII and were accordingly entitled to the protection of this information against disclosure to unauthorized third parties.

163.     Defendant owed a duty to its current and former employees (and their spouses and dependents), including Plaintiffs and the Class, to keep this information confidential.

164.     The unauthorized acquisition (i.e., theft) by a third party of Plaintiffs and Class Members' PII is highly offensive to a reasonable person.

165.     The intrusion was into a place or thing which was private and entitled to be private. Plaintiffs and the Class (or their third-party agents) disclosed their sensitive and confidential information to Defendant, but did so privately, with the intention that their information would be kept confidential and protected from unauthorized disclosure. Plaintiffs and the Class were reasonable in their belief that such information would be kept private and would not be disclosed without their authorization.

166.     The Data Breach constitutes an intentional interference with Plaintiffs' and the Class's interest in solitude or seclusion, either as to their person or as to their private affairs or concerns, of a kind that would be highly offensive to a reasonable person.

167.     Defendant acted with a knowing state of mind when it permitted the Data Breach because it knew its information security practices were inadequate.

168.     Defendant acted with a knowing state of mind when it failed to notify Plaintiffs and the Class in a timely fashion about the Data Breach, thereby materially impairing their mitigation efforts.

169.     Acting with knowledge, Defendant had notice and knew that its inadequate cybersecurity practices would cause injury to Plaintiffs and the Class.

170.     As a proximate result of Defendant's acts and omissions, the private and sensitive PII of Plaintiffs and the Class were stolen by a third party and is now available for disclosure and redisclosure without authorization, causing Plaintiffs and the Class to suffer damages (as detailed *supra*).

171.     And, on information and belief, Plaintiffs' PII has already been published—or will be published imminently—by cybercriminals on the Dark Web.

172.     Unless and until enjoined and restrained by order of this Court, Defendant's wrongful conduct will continue to cause great and irreparable injury to Plaintiffs and the Class since their PII are still maintained by Defendant with their inadequate cybersecurity system and policies.

173.     Plaintiffs and the Class have no adequate remedy at law for the injuries relating to Defendant's continued possession of their sensitive and confidential records. A judgment for monetary damages will not end Defendant's inability to safeguard the PII of Plaintiffs and the Class.

174.     In addition to injunctive relief, Plaintiffs, on behalf of themselves and the other Class Members, also seek compensatory damages for Defendant's invasion of privacy, which

includes the value of the privacy interest invaded by Defendant, the costs of future monitoring of their credit history for identity theft and fraud, plus prejudgment interest and costs.

**FOURTH CAUSE OF ACTION**
**Unjust Enrichment**
**(On Behalf of Plaintiffs and the Class)**

175.     Plaintiffs incorporate by reference all other paragraphs as if fully set forth herein.

176.     This claim is pleaded in the alternative to the breach of implied contract claim.

177.     Plaintiffs and Class Members (or their third-party agents) conferred a benefit upon Defendant. After all, Defendant benefitted from (1) using their PII to facilitate employment, and (2) using their labor to derive profit.

178.     Defendant appreciated or had knowledge of the benefits it received from Plaintiffs and Class Members (or their third-party agents).

179.     Plaintiffs and Class Members (or their third-party agents) reasonably understood that Defendant would use adequate cybersecurity measures to protect the PII that they were required to provide based on Defendant's duties under state and federal law and its internal policies.

180.     Defendant enriched itself by saving the costs they reasonably should have expended on data security measures to secure Plaintiffs' and Class Members' PII.

181.     Instead of providing a reasonable level of security, or retention policies, that would have prevented the Data Breach, Defendant instead calculated to avoid its data security obligations at the expense of Plaintiffs and Class Members by utilizing cheaper, ineffective security measures. Plaintiffs and Class Members, on the other hand, suffered as a direct and proximate result of Defendant's failure to provide the requisite security.

182. Under principles of equity and good conscience, Defendant should not be permitted to retain the full value of Plaintiffs' and Class Members' (1) PII and (2) employment because Defendant failed to adequately protect their PII.

183. Plaintiffs and Class Members have no adequate remedy at law.

184. Defendant should be compelled to disgorge into a common fund—for the benefit of Plaintiffs and Class Members—all unlawful or inequitable proceeds that it received because of its misconduct.

**FIFTH CAUSE OF ACTION**
**Declaratory Judgment**
**(On Behalf of Plaintiffs and the Class)**

185. Plaintiffs incorporate by reference all other paragraphs as if fully set forth herein.

186. Under the Declaratory Judgment Act, 28 U.S.C. §§ 2201, *et seq*., this Court is authorized to enter a judgment declaring the rights and legal relations of the parties and to grant further necessary relief. The Court has broad authority to restrain acts, such as those alleged herein, which are tortious and unlawful.

187. In the fallout of the Data Breach, an actual controversy has arisen about Defendant's various duties to use reasonable data security. On information and belief, Plaintiffs allege that Defendant's actions were—and *still* are—inadequate and unreasonable. And Plaintiffs and Class Members continue to suffer injury from the ongoing threat of fraud and identity theft.

188. Given its authority under the Declaratory Judgment Act, this Court should enter a judgment declaring, among other things, the following:

    a. Defendant owed—and continues to owe—a legal duty to use reasonable data security to secure the data entrusted to it;

      b.      Defendant has a duty to notify impacted individuals of the Data Breach under the common law and Section 5 of the FTC Act;

      c.      Defendant breached, and continues to breach, its duties by failing to use reasonable measures to the data entrusted to it; and

      d.      Defendant breaches of its duties caused—and continues to cause—injuries to Plaintiffs and Class Members.

189.    The Court should also issue corresponding injunctive relief requiring Defendant to use adequate security consistent with industry standards to protect the data entrusted to it.

190.    If an injunction is not issued, Plaintiffs and the Class will suffer irreparable injury and lack an adequate legal remedy if Defendant experiences a second data breach.

191.    And if a second breach occurs, Plaintiffs and the Class will lack an adequate remedy at law because many of the resulting injuries are not readily quantified in full and they will be forced to bring multiple lawsuits to rectify the same conduct. Simply put, monetary damages—while warranted for out-of-pocket damages and other legally quantifiable and provable damages—cannot cover the full extent of Plaintiffs and Class Members' injuries.

192.    If an injunction is not issued, the resulting hardship to Plaintiffs and Class Members far exceeds the minimal hardship that Defendant could experience if an injunction is issued.

193.    An injunction would benefit the public by preventing another data breach—thus preventing further injuries to Plaintiffs, Class Members, and the public at large.

## PRAYER FOR RELIEF

Plaintiffs and Class Members respectfully request judgment against Defendant and that the Court enter an order:

A.    Certifying this case as a class action on behalf of Plaintiffs and the proposed Class, appointing Plaintiffs as class representative, and appointing their counsel to represent the Class;

B.    Awarding declaratory and other equitable relief as necessary to protect the interests of Plaintiffs and the Class;

C.    Awarding injunctive relief as necessary to protect the interests of Plaintiffs and the Class;

D.    Awarding Plaintiffs and the Class damages including applicable compensatory, exemplary, punitive damages, and statutory damages, as allowed by law;

E.    Awarding restitution and damages to Plaintiffs and the Class in an amount to be determined at trial;

F.    Awarding attorneys' fees and costs, as allowed by law;

G.    Awarding prejudgment and post-judgment interest, as provided by law;

H.    Granting Plaintiffs and the Class leave to amend this complaint to conform to the evidence produced at trial; and

I.    Granting other relief that this Court finds appropriate.

## DEMAND FOR JURY TRIAL

Plaintiffs demand a jury trial for all claims so triable.

Date: October 21, 2024           Respectfully submitted,

*/s/ Terence R. Coates*
Terence R. Coates (0085579)
Dylan J. Gould (0097954)
**MARKOVITS STOCK & DE MARCO, LLC**

119 East Court Street, Suite 530
Cincinnati, Ohio 45202
Telephone: (513) 651-3700
Facsimile: (513) 665-0219
*tcoates@msdlegal.com*
*dgould@msdlegal.com*

Samuel J. Strauss*
Raina C. Borrelli*
**STRAUSS BORRELLI PLLC**
980 N. Michigan Avenue, Suite 1610
Chicago, Illinois 60611
T: (872) 263-1100
F: (872) 263-1109
sam@straussborrelli.com
raina@straussborrelli.com

*Pro hac vice* forthcoming

*Attorneys for Plaintiffs and the Proposed Class*